STATE of Missouri, Respondent,

v.

Harvey E. SMITH, Sr., Appellant.

No. WD 63161.

Missouri Court of Appeals,
Western District.

Dec. 7, 2004.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 1, 2005.

Application for Transfer Denied
April 5, 2005.

Amy Marie Bartholow, Appellate Public
Defender, Columbia, MO, for Appellant.

Deborah Daniels, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

Before HOWARD, P.J., ULRICH and BRECKENRIDGE, JJ.

VICTOR C. HOWARD, Presiding Judge.

Harvey Smith appeals from the judgment entered upon his conviction by a jury of attempted manufacture of methamphetamine ("meth"), a controlled substance, in violation of section 195.211.1.[1] He raises two points on appeal. First, Smith claims the trial court abused its discretion in overruling his motion to dismiss Count I of the information, which alleged manufacturing of meth. He claims the trial court should have dismissed Count I because law enforcement officials violated his due process rights and the process required by section 490.733 by purposefully destroying all of the hazardous materials seized during the search of Smith's basement without collecting representative samples and without "the approval of the affected court," which conduct he claims amounts to bad faith. Second, Smith claims the trial court plainly erred in failing to define "possession" in its instruction to the jury on the attempted manufacture of meth charge.

For the reasons set forth below, we affirm the trial court's judgment.

## Background

Smith does not challenge the sufficiency of the evidence to support his conviction. When viewed in a light most favorable to the verdict, the evidence at trial showed as follows:

Around midnight on January 26, 2002, Officers[2] Shawn Collie and Howard Judd of the Buchanan County Drug Strike Force were conducting surveillance of a suspected "crack house" in the 2700 block of Mary Street in St. Joseph, Missouri. When the officers turned off the car and rolled down the windows, they smelled the distinct odor of ether coming from Smith's residence at 2710 Mary Street. Officer Collie also smelled anhydrous ammonia, but Officer Judd could not initially smell the ammonia due to a sinus infection. The officers were familiar with the distinct ether odor due to their extensive anti-meth training and from their experiences in working with the chemical.

Officer Collie radioed for backup, and other undercover officers in the area came to the scene. Officer Collie knew that Smith, his wife, Toni, and her brother, David Amos, lived in the home. As the officers approached the home, David came out the back door of the home to meet them. The officers, who noticed a fog or haze and strong ether and anhydrous ammonia odors coming from inside the home, informed David that they were evacuating the home because they determined it posed a safety hazard, and they asked for his assistance. David opened the door and yelled for Toni. Toni came into the kitchen, and Officer Judd explained that she was going to have to evacuate the home. Toni immediately turned around and went to her bedroom, telling the officers she needed her shoes. She closed the bedroom door behind her. Officer Judd heard Toni talking to someone while she was in the room. When Toni came out, she told the officers to leave. Officer Judd went in the room, but he found no one else there. She told Officer Judd that she did not know where Smith was. They ordered

---

1. Statutory references are to the Revised Statutes of Missouri 2000.

2. For simplification purposes only, we refer generally to the members of the Drug Strike Force as "officers" rather than by their official rank.

Toni to leave the home. Toni's fifteen-year-old son and his friend were also evacuated from the home.

While checking the bedroom for any remaining occupants, Officer Judd thought he heard noises in the basement through an air vent. The only access to the basement was by a stairway outside the home. Officers Collie and Parsons went to the bottom of the basement stairs, where they heard shuffling noises, so they began knocking loudly on the locked door. Officers announced their presence and ordered Smith to come out of the basement. Smith responded that he was in the shower. He informed them that he did not want to leave and told the officers to go away. At that point, the chemical haze from the anhydrous ammonia that the officers had encountered when first entering the upstairs of the home became much worse.

About a minute later, Smith opened the door; he was naked and dripping wet. As soon as Smith opened the door, a thick chemical "cloud" of anhydrous ammonia came out of the basement and enveloped the officers in the stairway. The cloud was consistent with large amounts of anhydrous ammonia having been dumped, which the officers knew to be dangerous. Officers ordered Smith to grab a pair of pants and removed him from the basement.

After evacuating and securing the home, officers obtained a search warrant. Officers Collie and Steve Gumm dressed in hazardous material suits and entered the basement. In the basement, they found a mostly empty bottle of drain cleaner in the trash can; a garden sprayer with its hose cut; a red and white drink cooler, which Officer Collie determined contained anhydrous ammonia; and a yellow pitcher laying next to the drain in the shower room, which was empty but still smelled of chemicals. On the basement steps, officers located another drink cooler containing a mason jar filled with a liquid they determined to be ether.

When they conducted their search of the upstairs portion of the home, officers found in the master bedroom: a police scanner, night vision goggles, unused syringes, scales, three syringes containing meth, $130, and a plastic baggie with the corner cut off. In the living room officers found: marijuana, pliers, a pair of hemostats with a marijuana cigarette attached, and a black pipe.

The State charged Smith with both manufacturing and possessing meth. On May 9, 2003, Smith moved to dismiss the manufacturing charge in Count I, or, in the alternative, to exclude evidence of the presence of ether. Smith maintained that the officers destroyed the alleged ether without getting prior approval of the court and without collecting representative samples in violation of section 490.733. After hearing arguments on the motion just prior to trial, the court denied the motion, concluding that there was no criminal violation of section 575.100 and that section 490.733 did not mandate the state to preserve representative samples of the hazardous materials.

On June 10, 2003, the case proceeded to trial. The officers involved in the investigation of Smith's home testified for the State. They detailed hundreds of hours of training, which culminated in certifications for drug and meth lab investigations. They had been involved in a large number of meth lab investigations and, having smelled the chemicals hundreds of times, were very familiar with the distinctive smell of ether and anhydrous ammonia and were also familiar with its appearance. The non-hazardous materials that were seized were booked into evidence. The hazardous materials, including the anhydrous ammonia and ether, were photo-

graphed, placed in containers and destroyed in accordance with DEA and EPA guidelines. Such chemicals are not stored as evidence and are not accepted for testing by the highway patrol because of the danger they pose. In fact, while awaiting transport to a destruction bunker, the anhydrous ammonia expanded, burst its container, and contaminated the police garage. In the process it evaporated.

Smith extensively cross-examined the officers and did not put on any of his own evidence. At the close of all of the evidence, the trial court found the State failed to make a submissible case on Count II, possession of meth, and granted Smith's motion for judgment of acquittal on that count. As to Count I, the court determined that the State had only made a submissible case of attempted manufacturing of meth and instructed the jury accordingly. The jury found Smith guilty of the class B felony of attempt to manufacture a controlled substance. The trial court subsequently sentenced him as a prior and persistent offender to fifteen years incarceration in the Missouri Department of Corrections. This appeal follows.

## Point I

In his first point on appeal, Smith claims the trial court abused its discretion in overruling his motion to dismiss Count I of the information. Specifically, he argues

that his due process rights, under the U.S. and Missouri Constitutions, and his rights under Section 490.733 were violated when:

law enforcement, who are bound to uphold the law, violated the process set forth by the Missouri legislature in Section 490.733 by purposefully destroying all of the hazardous materials seized during the search without collecting representative samples and without "the approval of the affected court," which conduct amounts to bad faith.

Section 490.733.2 provides:

Notwithstanding the provisions of section 575.100, RSMo, and with the approval of the affected court, any law enforcement officer who seizes hazardous materials as evidence related to a criminal investigation may collect representative samples of such hazardous materials, and destroy or dispose of, or direct another person to destroy or dispose of the remaining quantity of such hazardous materials.

The narrow question before this court is whether, under this statute, dismissal of Count I (manufacturing of a controlled substance) was required when the law enforcement officers did not retain representative samples of the hazardous materials seized in the investigation and entirely disposed of the hazardous materials without "the approval of the affected court." [3]

**3.** Prior to trial, in the alternative to dismissal of Count I, Smith's counsel moved for the exclusion of evidence regarding the presence of ether. In both that pre-trial motion and in the argument portion of his brief on appeal, Smith mentions the destruction of the ether and anhydrous ammonia in violation of the court's explicit order in the search warrant that evidence seized thereunder be retained for a certain amount of time. But, his point on appeal is limited to the court's error in not *dismissing* Count I because dismissal was required due to law enforcement's failure to follow section 490.733. He does not challenge on appeal the court's denial of his re-

quest to exclude, and the court's subsequent admission, of the officer's "sight and smell" evidence of ether and anhydrous ammonia. Nor is the argument concerning an alleged violation of the search warrant, which warrant is not a part of the record on appeal, mentioned in his point on appeal or fully developed in the argument portion of his brief. Accordingly, we do not specifically consider those issues. *See, e.g. Collins v. Hertenstein*, 90 S.W.3d 87, 96 n. 3 (Mo.App. W.D. 2002) (citing *Berger v. Huser*, 498 S.W.2d 536, 539 (Mo.1973) in explaining that "[e]rrors raised for the first time in the argument por-

■ The issue of constitutionally guaranteed access to evidence was dealt with in the case of *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988), where the Court held that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." The Supreme Court also stated that exculpatory value of the evidence must be " 'apparent' " which means bad faith turns "on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.,* 488 U.S. at 56 at n.\*, 109 S.Ct. at 336 n. \* (quoting and citing *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984)).

In our case there is no indication whatsoever that the officers knew beforehand that the items of evidence were exculpatory before they were destroyed. Accordingly, there was no bad faith on the part of the officers so as to constitute a denial of due process of law that, in turn, would require the dismissal of Count I.

■ The other part of Smith's argument in Point I is that because the evidence was disposed of without a court order and before samples were taken, Count I should have been dismissed. Even if we were to agree with Smith's premise that Section 490.733.2 requires officers to obtain a court order before destroying hazardous evidence, we do not agree that failure to do so requires dismissal of the charges against a defendant. The statute clearly does not, by its language, mandate a dismissal. In fact it does not specify any certain remedy.

In *State v. Puckett,* 146 S.W.3d 19, 24 (Mo.App. E.D.2004), the Eastern District

likened Section 490.733.2 to Rule 25.18, Missouri's discovery rule that allows the exclusion of evidence as a sanction for the violation of rules and orders. In *Puckett* the court stated, "[a]s with our Supreme Court's discovery rules, the statute sets forth requirements for the procedural handling of evidence that strike a balance between the State's duty to preserve evidence and the defendant's right to access evidence necessary for [his or] her defense." *Id.*

As we noted earlier, whether the trial judge should have excluded evidence at trial, as a sanction, is not at issue in this appeal. We simply hold that the court was not required to dismiss Count I of the information in this case. Point I is denied.

### Point II

■ On Count I, attempted manufacturing of a controlled substance, the trial court instructed the jury as follows:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about January 26, 2002, in the County of Buchanan, State of Missouri, the defendant possessed chemicals and equipment commonly used in the manufacture of methamphetamine, and

Second, that such conduct was a substantial step toward the commission of the

offense of manufacturing methamphetamine, a controlled substance, by a combination of extraction and chemical synthesis, and

Third, that defendant engaged in such conduct with the purpose of committing

tion of the brief and that are not raised in the point relied on need not be considered by this

court.")

such offense of manufacturing a controlled substance,

then you will find the defendant guilty under Count I of attempting to manufacture a controlled substance.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

A person commits the crime of manufacturing or producing a controlled substance if he knowingly manufactures or produces a controlled substance and he knew or was aware that it was methamphetamine, a controlled substance.

As used in this instruction, the term "substantial step" means conduct which is strongly corroborative of the firmness of the defendant's purpose to complete the commission of the offense of manufacturing a controlled substance.

In his second point on appeal, Smith claims that the trial court plainly erred when it did not define the term "possession" in this instruction. He argues that "possession" should have been defined because it was "a crucial element of this case, where [Smith]'s defense was that, as among the three adults living in the home, [Smith] did not have knowledge or control of the ether that was found outside on the basement steps or of the other precursors found in the basement."

Although Smith's counsel raised this issue in his motion for judgment of acquittal or in the alternative for a new trial, he did not raise the issue at the instruction conference. Rule 28.03 provides:

Counsel shall make specific objections to instructions or verdict forms considered erroneous. No party may assign as error the giving or failure to give instructions or verdict forms unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection. Counsel need not repeat objections already made on the record prior to delivery of the instructions and verdict forms. The objections must also be raised in the motion for new trial in accordance with Rule 29.11.

Smith concedes that this issue was not properly raised before the trial court and requests plain error review under Rule 30.20. Missouri appellate courts have interpreted plain error review as a two-step process. *State v. Hagan*, 113 S.W.3d 260, 267 (Mo.App. W.D.2003). First, we examine " 'whether the allegation of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. In effect, an appellate court must determine whether, on the face of the claim, "plain error" has, in fact, occurred.' " *Id.* (quoting *State v. Brown*, 97 S.W.3d 97, 100 (Mo.App. W.D. 2002)). If not, we should decline to exercise our discretion to further review the claim. *Id.* If so, " 'step two of the process authorizes the appellate court,' in its discretion, 'to determine whether the claimed error resulted in manifest injustice or a miscarriage of justice.' " *Id.* (quoting *Brown*, 97 S.W.3d at 100). With regard to Smith's claim of instructional error, this court has consistently held:

The plain error rule should be used sparingly and does not justify a review of every alleged trial error that has not been properly preserved for appellate review. Instructional error such as that alleged by Appellant seldom rises to the level of plain error. For us to find such plain error, Appellant must demonstrate more than mere prejudice; he must establish that the trial court has so misdirected or failed to instruct the jury that it is apparent to us that the instructional error affected the jury's verdict.

*Id.* (Internal quotation marks and citations omitted.)

Smith acknowledges that MAI–CR3d 325.06.2, which the above attempted manufacture instruction was patterned after, and its accompanying Notes on Use do not list "possession" as one of the terms that is required to be defined in all cases or that is authorized to be defined by the court on its own motion or upon written request of the parties. Likewise, Smith acknowledges that the Notes on Use to MAI–CR3d 333.00, the pattern instruction for definitions of terms, do not provide that possession is required or authorized to be defined in an attempted manufacturing case. But, as Smith points out, "[i]f an instruction following MAI–CR3d conflicts with the substantive law, any court should decline to follow MAI–CR3d or its Notes on Use." *State v. Farris,* 125 S.W.3d 382, 391 (Mo.App. W.D.2004) (citation and quotation marks omitted).

Smith relies on this court's opinion in *Farris* to argue that the trial court plainly erred in not defining possession in instructing on attempted manufacturing. In *Farris,* the evidence showed that Mr. Farris was one of three men in a car. *Id.* at 386. As police officers tried to pull the car over after receiving a call from a citizen who had earlier driven past the car parked on the wrong side of the road and smelled ether, they "smelled a very strong odor of ether, which was not [previously] present." *Id.* at 385. When the officers finally pulled the car over, they discovered glassware in the passenger compartment of the car, which smelled of ether. *Id.* at 386. Mr. Farris was a passenger in the car, which belonged to William Zike, one of the other men in the car. *Id.* In searching the areas along the county roads where they had pursued the car, the officers discovered several items commonly used in the manufacture of meth. *Id.* After obtaining a warrant, they searched the car's trunk, where they found more materials commonly used in the manufacture of meth. *Id.* The state charged Mr. Farris with knowingly attempting to manufacture a controlled substance " 'by possessing items used in the manufacturing of methamphetamine, knowing that it was a controlled substance' " in violation of section 195.211. *Id.* Mr. Farris' defense was that the other two men had come to his home after the caller had seen the car. *Id.* "He claimed that [the two men] picked him up to take him to meet his brother, so he and his brother could go to a bar after his brother got off work. [He] testified that he never smelled ether while he was in the car." *Id.* The jury found him guilty as charged. *Id.*

In considering Mr. Farris' claim that the trial court plainly erred in submitting the verdict director for attempt to manufacture without defining "possession," this court found that "[t]he substantial step charged was that Mr. Farris possessed items used in the manufacture of methamphetamine." *Id.* at 391. We explained:

> [F]or Mr. Farris' possession to constitute criminally liable conduct, his possession had to be a voluntary act. *State v. Jones,* 865 S.W.2d 658, 662 (Mo. banc 1993) (citing section 562.011.1). "Possession is a voluntary act if the possessor knowingly procures or receives the thing possessed, or having acquired control of it was aware of his control for a sufficient time to have enabled him to dispose of it or terminate his control." Section 562.011.3. The definition of possession, as used in section 195.211.1, includes this knowledge requirement, as it provides that "a person, with knowledge of the presence and nature of a substance, has actual or constructive possession of the substance." Section 195.010(34).

*Id.* at 391–92. Because "Mr. Farris did not have actual possession of the [manufacturing] items," the state had to prove he had "constructive possession" of them, as that term is defined in section 195.010(34). *Id.* at 392. We explained:

To establish constructive possession, as it is defined in section 195.010(34), the Supreme Court requires the State to prove that the defendant "had access to and control over the premises where the materials were found." [*State v.*] *Withrow,* 8 S.W.3d [75,] at 80 [ (Mo. banc 1999) ]. Because Mr. Farris did not have exclusive control over the premises where the materials were found, the Supreme Court requires further evidence "to connect him to the manufacturing process." *Id.* This is because "[t]he mere fact that a defendant is present on the premises where the manufacturing process is occurring does not by itself make a submissible case." *Id.* Likewise, "proximity to the contraband alone fails to prove ownership." *Id.* Rather, there must also "be some incriminating evidence implying that the defendant knew of the presence of the manufacturing process, and that the materials or the manufacturing process were under his control." *Id.*

This incriminating evidence establishes the defendant's knowledge and control of the items, which bear directly on whether possession of the items is a voluntary and, therefore, criminal, act. Section 562.011.1 and .3. Thus, Mr. Farris' knowledge and control of the items were facts necessary to find possession.

*Id.* We then concluded:

Possession was an essential element of the crime of attempt to manufacture methamphetamine, as it was the only substantial step alleged. By not including the MAI–CR3d 333.00 definition of possession, the verdict director failed to require the jury to find "every fact necessary to constitute essential elements of [the] offense charged." *Id.* (internal quotation marks and citations omitted.)

Discussing *Jones,* 865 S.W.2d at 661–662, we then found that the error was prejudicial, so that Mr. Farris "facially established substantial grounds for this court to believe that he [had] suffered manifest injustice or a miscarriage of justice from this error." *Id.* at 393.

■  Having so concluded, this court exercised its discretion to consider whether the failure to define "possession" actually resulted in manifest injustice or a miscarriage of justice, under the facts of that case, focusing on whether " 'the trial court has so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error affected the jury's verdict.' " *Id.* (quoting *State v. Doolittle,* 896 S.W.2d 27, 29 (Mo. banc 1995)). First, we pointed out that "possession was not only an essential element of the crime charged, but it was a *contested* essential element." *Id.* Specifically, we explained:

The defense contended that the State failed to prove that Mr. Farris had the requisite knowledge and control for constructive possession, as defense counsel argued that Mr. Farris became a passenger in Mr. Zike's car after 11:30 P.M., subsequent to the time Ms. Brand saw three individuals on the side of the road; he did not know about the items found in the trunk; and there was a lack of evidence that Mr. Farris was the person who threw the items out of the car window.

The resulting prejudice [was] that, without a definition of possession explaining what facts are necessary to find constructive possession, the State was excused from its burden of proof on a contested element of the crime. Indeed,

in its closing argument, the State addressed the evidence supporting the element of possession by arguing, "Possession? It came out of the vehicle the defendant was riding in. It was thrown from the side of the vehicle that the defendant was riding in." The State's argument led the jury to believe that the element of possession was proved by merely establishing Mr. Farris' proximity to the items as a passenger in the car. Not only is the State's concept of possession contrary to the statutory definition of constructive possession contained in section 195.010(34), but it was also rejected by the Supreme Court in *Withrow,* 8 S.W.3d at 80.

*Id.* at 393–94 (some citations omitted).

We then concluded:

"[W]here a verdict director effectively omits an essential element of the offense, such an instruction rises to the level of plain error if the evidence in the case fails to establish the existence of the omitted element 'beyond serious dispute.'" [*State v.*] *Harney,* 51 S.W.3d [519,] at 533–34 [ (Mo.App.W.D.2001) ] (citation omitted). In this case, Mr. Farris was one of three persons in the car and was not the owner of the car. Several of the items found were in the locked trunk of the car. While the officers found other items on the passenger side of the road and Mr. Farris was one of two passengers in the car, it is unclear whether he was in the front or back seat, and it is unclear from which passenger seat the items were thrown. It is also disputed whether Mr. Farris was with the other two men when Ms. Brand saw them parked on the side of the road, engaged in the manufacturing process. Although this court has found that there was sufficient additional incriminating circumstances to prove Mr. Farris' constructive possession of the

items beyond a reasonable doubt, this court does not find that the evidence on this issue was "beyond serious dispute." *Id.* at 394.

In the case now before us, Smith argues that "[t]he trial court had directed a verdict on another count of actual possession because the State failed to prove that Smith, as among the three adults in the house, possessed the methamphetamine." He insists that "possession was the crux of the attempted manufacturing charge as well, and unless the Court corrects this error in failing to instruct on possession, manifest injustice will inexorably result."

The State concedes that following *Farris,* the definition of "possession" was required to be in the instruction. Thus, because Smith's claim facially establishes plain error, we must consider whether an actual manifest injustice or a miscarriage of justice occurred in Smith's case. We conclude that it did not.

Mr. Farris was one of three individuals in the car where the manufacturing items were found locked in the trunk, he did not own the car, and the evidence was unclear as to where Mr. Farris rode as a passenger in the car and from which passenger seat the items were thrown. *Id.* There was also disputed evidence as to "whether Mr. Farris was with the other two men when [the citizen that called the police] saw them parked on the side of the road, engaged in the manufacturing process." *Id.* "Although this court has found that there was sufficient additional incriminating circumstances to prove Mr. Farris' constructive possession of the items beyond a reasonable doubt, ... the evidence on [that] issue was [not] 'beyond serious dispute.'" *Id.* The essential element of possession was strongly contested, and the state incorrectly argued to the jury that it could convict Mr. Farris simply for being in the car. *Id.*

Under those circumstances, this court was concerned that the jury could have found Mr. Farris guilty without finding he "constructively possessed" the meth lab items, which possession was the only substantial step he allegedly took in attempting to manufacture a controlled substance. Here, however, the evidence establishes "beyond serious dispute" that Smith actually, not constructively, "possessed chemicals and equipment commonly used in the manufacture of methamphetamine." Smith was alone, locked in the basement of the home, which was only accessible from a stairway entrance entirely separate from the home. When the officers tried to get Smith's wife to leave the upstairs portion of the home, she went into the bedroom, where she was overheard talking to someone. As soon as she left the room, the officers determined that no one was in the room with her, but they heard noises coming from the basement through an air vent. At about that same time, the chemical cloud known by the officers to be caused by dumping anhydrous ammonia became stronger. After evacuating the upstairs of the home, the officers went to the basement and knocked loudly on the door, calling for Smith. Smith refused to open the door, claiming he was taking a shower and demanding that the officers leave. When Smith finally opened the door about a minute later, a strong anhydrous ammonia cloud rushed out of the basement and enveloped the officers. After obtaining a warrant, the officers discovered in the basement: a mostly empty bottle of drain cleaner in the trash can; a garden sprayer with its hose cut; a red and white drink cooler containing anhydrous ammonia; and a yellow pitcher laying next to the drain in the shower room, which was empty but still smelled of chemicals. On the basement steps, officers located another drink cooler containing a mason jar filled with a liquid they determined to be ether.

This evidence of the essential element of possession in this case does not present the same concerns as the contested evidence of possession before this court in *Farris*, and the State did not improperly argue the element of possession to the jury. We conclude that no actual manifest injustice or miscarriage of justice occurred as a result of the trial court's failure to *sua sponte* define "possession" in the attempted manufacture verdict director. Point II is denied.

### Conclusion

Having concluded that the trial court did not err in denying Smith's motion for dismissal of Count I and did not plainly err in not defining "possession" in the verdict director, we affirm the trial court's judgment.

ULRICH and BRECKENRIDGE, JJ., concur.